**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

E.M.M.,
N.M.M., and
G.J.M., individually

                Plaintiffs                                      JURY DEMANDED

v.

Douglas County, Colorado,
Lesa Adame, individually and
Carl Garza, individually
                Defendants

_____

**COMPLAINT**
_____

      E.M.M., N.M.M. and G.J.M., individually as Plaintiffs, allege and state:

      1.    Plaintiffs' claims arise under 42 U.S.C. § 1983 from a series of acts leading up to May 6, 2009, at a time when they were minor children, and were unconstitutionally seized in Douglas County, Colorado, without a warrant or valid court order, without an exigency and without consent, from a private home and wrongfully detained for five days in Kansas. Defendants' actions were conducted under color of state law, without due process or probable cause and as the result of a conspiracy, depriving Plaintiffs of procedural due process, their liberty, their right to familial association, their right to travel and their rights under the Privileges and Immunities Clause of Article IV of the United States Constitution and the Uniform Child Custody Jurisdiction and Enforcement Act, C.R.S. §14-13-101 *et seq.*.

1

## JURISDICTION AND VENUE

2.      Jurisdiction is authorized under 42 U.S.C. § 1983 (civil rights), 28 U.S.C.

§1331 (authority for civil actions), 28 U.S.C. §1343 (redress for the deprivation of

rights).

3.      Venue is proper under 28 U.S.C. § 1391(b)(2), because "a substantial part

of the events" giving rise to the claim occurred in the District of Colorado.

## PARTIES

4.      Plaintiffs. are over the age of 18, reside in Littleton, Colorado, and bring

suit on their own behalf within two years of having turned 18.

5.-9.    Intentionally left blank.

10.     Defendant Lesa Adame, at the relevant times, was a social worker acting

under color of state law, being then an employee of the Colorado Department of Social

Services and/or Douglas County Department of Human Services, and is sued

individually, although liability is not sought on the basis of *respondeat superior*.

11.     Defendant Carl Garza, at the relevant times, acted under color of state

law, being then an employee of the Douglas County Sheriff's Office, and is sued

individually, although liability is not sought on the basis of *respondeat superior*.

12.     Douglas County, Colorado, is a Colorado political subdivision with

authority over the Douglas County Sheriff's Office, although liability is not sought on the

basis of *respondeat superior*.

## FACTUAL ALLEGATIONS

13.     John Doe ("Mr. Doe") and Jane Doe ("Mrs. Doe") (together, the "Parents"),

2

who are not parties to this suit, are the parents of Plaintiffs and eight other children.

14.     Mrs. Doe holds a Bachelor of Science degree in nursing from Franciscan University of Steubenville, Ohio, and has worked as a registered nurse in hospital oncology.

15.     Mr. Doe holds a history degree from Franciscan University in Steubenville, Ohio, and owns a construction/remodeling business.

16.     Prior to moving to Colorado in 2009, the Parents and their ten children resided in Johnson County, Kansas.

17.     The Parents were friends from college days with another couple, Dr. and Mrs. G., who at the times relevant hereto, resided in unincorporated Douglas County, Colorado (the "G.'s").

18.     In the spring of 2008, one of the younger of ten Doe children began exhibiting troubling behavior and making troubling comments.

19.     The said child's comments implicated a relative on Mrs. Doe's side of the family of taking improper liberties with the child more than two years earlier, i.e., in 2006 or before.

20.     The Parents voluntarily made arrangements for counseling for the reporting child and for certain siblings who may have witnessed the crimes.

21.     By June of 2008, the Parents had learned sufficient details to decide to make a report to Kansas state authorities at SRS/DCF.

22.     The Parents advised SRS/DCF that they had not allowed any of their children to have any contact with the said relative or any other members of Mrs. Doe's family after 2006.

23.     Gildner, Abney and Webb knew the Doe children were not in any present danger of physical abuse or neglect when the report was taken and thereafter.

24.     Abney or Webb assigned Gildner to communicate with the Doe family concerning their case.

25.     On or about June 13, 2008, Gildner met with Mrs. Doe at the Doe home to conduct a standard safety assessment of the home.

26.     In June of 2008, Gildner knew that:

a.      the Parents had voluntarily scheduled the child for counseling with a child psychologist, Dr. "C.";

b.      Dr. C. was employed by KVC Behavioral Healthcare, an entity approved to receive patient referrals from SRS/DCF;

c.      none of the Doe children was in danger of harm by the relative;

d.      none of the Doe children was in danger of harm or neglect by the Parents.

e.      Mrs. Doe had already conferred with attorneys and clergy.

f.      Gildner's safety assessment of the home revealed no evidence that the Parents were neglecting their children's physical needs.

27.     Gildner was advised early on in her handling of the case that the Does were hoping to move to Colorado and Gildner did not make known to the Parents any objection to their moving.

28.     Gildner never personally conducted a detailed fact finding interview with the reporting child, but "waited for the Sunflower House interview."

29.     The child confirmed her report at a Sunflower House interview on or about

4

July 7, 2008.

30.    Gildner, Abney and Webb utilized Sunflower House to conduct interviews with three older siblings on or about July 10, 2008.

31.    Gildner closed the SRS/DCF file after law enforcement informed her that criminal charges would not be brought against the relative.

32.    At the time that the SRS/DCF file was closed, Gildner, Webb and Abney knew that the reporting child was "receiving services in the community" through counseling.

33.    At no time was Mrs. Doe under an order by SRS/DCF to obtain counseling for herself.

34.    After SRS/DCF closed its file, the reporting child shared additional, more graphic details of the abuse, which the Parents reported to SRS/DCF.

35.    Gildner referred the child to Sunflower House again on or about November 26, 2008.

36.    Gildner confirmed that the child was receiving counseling at the time of the second Sunflower House interview.

37.    In November of 2008, Gildner re-opened the SRS/DCF file in connection with the reporting child's newly disclosed details.

38.    On or about December 8, 2008, an older child reported abuse by the same relative, which report was made during therapy with Dr. C. and was made known to SRS/DCF.

39.    Gildner received phone messages on January 5 and 6, 2009, from Mrs. Doe.

40.     On or about January 14, 2009, Gildner directed the second-reporting child to Sunflower House to be interviewed regarding her allegations of abuse.

41.     Mr. Doe was present at the said Sunflower House on the day of the interview of the second-reporting child on January 14, 2009.

42.     Gildner took a position that the abuse never occurred.

43.     Instead of verifying with the children's counselor, Dr. C., the validity of the children's independent reports, Gildner engaged on a course of conduct to smear Mrs. Doe.

44.     Gildner knew Mrs. Doe had been seeing a physician for pre-natal and post-delivery care.

45.     Without conferring with Mrs. Doe's physician or any other medical expert, Gildner baselessly pronounced that Mrs. Doe had post-partum depression and mental instability.

46.     Gildner had no medical qualifications to diagnose Mrs. Doe with post-partum depression or mental instability.

47.     Gildner took a position that the Doe children would be harmed if SRS/DCF personnel interviewed them about new details of abuse.

48.     Gildner, disregarding their existing counseling regimen, took a position that the Doe children needed counseling to overcome their supposed false beliefs about the abuse.

49.     Gildner took a position that Mrs. Doe needed counseling to overcome her supposed false beliefs about the abuse.

50.     Mrs. Doe agreed to begin counseling in an effort to satisfy Gildner's

6

outrageous demands that she do so.

51.     Gildner took a position that if the Parents pursued legal action against the suspect, either civilly, criminally, or through further investigation conducted by SRS/DCF, the children would be harmed by "borderline emotional abuse."

52.     Gildner communicated her positions, set forth above, to Mr. and Mrs. Doe.

53.     Because Gildner disbelieved the children's claims of abuse and had embarked on a smear campaign against Mrs. Doe, Mr. and Mrs. Doe attempted to cease contact with Gildner, even though they themselves had voluntarily initiated the opening of the case with SRS/DCF.

54.     At the time that Mr. and Mrs. Doe attempted to cease contact with Gildner, Gildner, Abney and Webb had no intention of further investigating the children's claims of abuse, and Gildner had taken an adversarial position to the Parents.

55.     Mr. Doe communicated to Webb and Abney that he did not wish to have further contact with Gildner due to the animosity created by her antagonistic, biased and baseless positions.

56.     Webb and Abney refused to replace Gildner with someone different and thereby actively supervised, authorized, agreed to, and participated in Gildner's actions with knowledge of the circumstances.

57.     Gildner contacted Mr. Doe despite knowing that he had asked her superiors to remove her from their case.

58.     After Mr. Doe complained about her, Gildner retaliated by threatening to initiate a court action.

59.     After Mr. Doe complained about her, Gildner further retaliated by requiring

that the entire family participate in "Family Preservation Services," intending to cause the Parents and children to stop believing that the children's abuse had occurred.

60.    Gildner met with Webb and Abney, who approved of her taking retaliatory legal action against Mr. and Mrs. Doe and their ten children, thereby actively supervising, authorizing, agreeing to, and participating in Gildner's actions with knowledge of the circumstances.

61.    Gildner "offered Family Preservation Services" to Mr. Doe on or about January 20, 2009.

62.    On or about January 23, 2009, Gildner received a message from Mrs. Doe stating that instead of Family Preservation Services, "she was going to seek counseling services through Catholic Charities."

63.    Gildner made no objection to Mrs. Doe's decision to seek counseling through Catholic Charities instead of through Family Preservation Services.

64.    Following the said message from Mrs. Doe on January 23, 2009, Gildner did not contact the Parents until after Mr. Doe lodged a complaint against her.

65.    Gildner received, on or about February 12 and 23, 2009, two more reports regarding the allegations by the second-reporting child.

66.    Near the end of February 2009, Mr. Doe filed a formal complaint with SRS/DCF concerning Gildner's inaction.

67.    The SRS/DCF posture was to maintain the social worker, Gildner, who was the subject of a complaint, as the primary contact with the complainant, in this case, Mr. and Mrs. Doe.

68.    Despite his complaint about her, Gildner contacted Mr. Doe, who was

"very upset that [Gildner] was the one contacting him . . . because [his complaint] was about the services that [she] was providing and those that [she] was working with."

69.     Mr. Doe was concerned that no medical exams were ordered and no follow up interviews were being conducted.

70.     Gildner opposed conducting additional medical exams or interviews.

71.     Gildner sought to have a meeting with Mr. Doe to "discuss [her] concerns about the children being subjected to ongoing interviews and discuss how the family was going to move on from these allegations."

72.     Gildner disbelieved the children's claims of abuse and, in contrast, believed the denials by the suspected relative and the children's grandmother, who was the mother of both Mrs. Doe and the suspected relative.

73.     In talking to Mr. Doe, Gildner threatened him that "if they chose not to meet with us that we would possibly have to staff the case with the District Attorney's Office and possibly get the Court involved if they chose not to participate in services or meet with us to discuss the concerns."

74.     The reason Gildner insisted on meeting with Mr. Doe and imposing Family Preservation Services was to exercise heavy-handed punishment against the Parents for lodging a complaint against Gildner and/or to attempt to disabuse the Parents and their children of the notion that the abuse had occurred.

75.     Gildner knew that Mr. and Mrs. Doe thereafter communicated with Gildner's supervisors, Angela Webb and Tina Abney.

76.     At a "multidisciplinary meeting," SRS/DCF through Gildner, Abney and Webb recommended that if Mr. and Mrs. Doe refused to meet with Gildner, that she

9

"contact the DA's office for filing a child in need of care petition."

77.   On or about March 10, 2009, a third child of Mr. and Mrs. Doe was reported to SRS/DCF as having experienced abuse by the same suspected relative.

78.   The recommendation by Gildner, Abney and Webb to file a child in need of care petition was not based on the Doe children needing counseling services, because the children were then already receiving counseling services by a counseling group approved by SRS/DCF.

79.   The recommendation by Gildner, Abney and Webb to file a child in need of care petition was not based on Mrs. Doe not receiving counseling, because she had by then already agreed to receive counseling services through Catholic Charities.

80.   The recommendation by Gildner, Abney and Webb to file a child in need of care petition was not based on concerns for the children's safety because, firstly, the children had not been in contact with the suspected relative for more than two years and, secondly, Gildner, Abney and Webb wholly disbelieved the children's reports of abuse.

81.   The recommendation by Gildner, Abney and Webb to file a child in need of care petition was not based on a refusal to accept Family Preservation Services, because Mrs. Doe had agreed to private counseling to which SRS/DCF had voiced no objection, and further, because no formal order for Family Preservation Services was entered or served upon the Parents prior to the filing of the child in need of care petitions.

82.   Under K.S.A. 38-2202(d), Plaintiffs:

a.      were not without adequate parental care, control or subsistence;

10

b.    were not without care or control necessary for their physical, mental or emotional health;

c.    had not been physically, mentally or emotionally abused or neglected or sexually abused;

d.    had not been placed for care or adoption in violation of law;

e.    had not been abandoned nor were they without a known living parent;

f.    were not in violation of K.S.A. 38-2202(d)(7) through (13).

83.    The recommendation by Gildner, Abney and Webb to file child in need of care petitions was made without probable cause to believe that Plaintiffs met the definition for a "child in need of care" under K.S.A. § 2202 (d).

84.    The recommendation by Gildner, Abney and Webb to file a child in need of care petition was made:

a.    in retaliation for Mr. Doe's formal complaint about Gildner's handling of his children's reports of abuse;

b.    in an unconstitutional effort to stop Mr. and Mrs. Doe from exercising their rights to pursue criminal and civil claims against the suspected relative;

c.    as an unconstitutional punishment for allegedly discussing with the children their memories of abuse "outside of a therapeutic setting."

85.    On or about April 20, 2009, Gildner pursued her retaliation against Mr. and Mrs. Doe through Assistant District Attorney Jaclynn J.B. Moore, who filed ten Child-in-Need-of-Care ("CINC") petitions in the District Court for Johnson County, Kansas.

86.    The CINC petitions outrageously requested termination of Mr. and Mrs.

11

Doe's parental rights, appointment of a permanent custodian for Plaintiffs and their siblings, temporary removal of Plaintiffs and their siblings from their Parents' custody, and an order of child support.

87.     The basis for filing the ten CINC petitions was Gildner's referral to the DA's office, approved by Webb and Abney, and thereby they actively supervised, authorized, agreed to, and participated in Gildner's actions with knowledge of the circumstances.

88.     None of the CINC petitions sought immediate custody of the children.

89.     None of the CINC petitions prohibited travel by the Doe Parents and children.

90.     None of the CINC petitions set forth the fact that Mr. Doe had made a formal complaint about Gildner to SRS/DCF.

91.     All of the CINC petitions left Mr. and Mrs. Doe with unlimited custody of their children.

92.     The CINC petitions, filed on April 20, 2009, were set for a non-emergency hearing three weeks later, on May 11, 2009.

93.     On April 20, 2009, no emergency threatened the safety or health of the Plaintiffs or their siblings.

94.     According to Gildner's testimony, Mr. Doe contacted Abney on or about April 28, 2009, to agree to participate in Family Preservation Services.

95.     According to Gildner's testimony, Abney took no action to schedule Family Preservation Services and instead referred Mr. Doe to contact either Gildner or Webb.

96.     On April 28, 2009, no emergency existed so as to require Abney to

schedule Family Preservation Services or have the children seized.

97.     According to Gildner's testimony, Mr. Doe reiterated to Webb on or about April 29, 2009, his willingness to participate in Family Preservation Services.

98.     According to Gildner's testimony, Webb took no action to schedule Family Preservation Services and instead referred Mr. Doe again to Gildner, who would be in the office April 30, 2009.

99.     On April 29, 2009, no emergency existed so as to require Webb to schedule Family Preservation Services or have the children seized.

100.    On April 30, 2009, Gildner took a call from someone (in the suspected relative's family) who was wondering if the Parents and children had left town.

101.    On April 30, 2009, Gildner left a message on Mr. Doe's cell phone about "Family Preservation Services."

102.    Other than leaving a message on Mr. Doe's cell phone on April 30, 2009, Gildner made no further effort to contact the Parents prior to May 4, 2009.

103.    On May 1, 2, 3 and 4, no emergency existed that required Gildner to attempt to schedule Family Preservation Services or have the children seized.

104.    On Monday May 4, 2009, Gildner was aware that members of the Doe family were in Colorado, but decided to make an uninvited visit to the Doe home, where she was met by Mr. Doe as she was getting out of her car.

105.    Mr. Doe instructed Gildner that all contact needed to be through his attorney, whose name he provided to Gildner.

106.    Gildner failed and refused to call the Does' attorney.

107.    At no time did SRS/DCF, Gildner, Webb or Abney advise Mr. or Mrs. Doe

13

that they were prohibited from traveling out of town prior to the CINC hearing scheduled for May 11, 2009.

108.   In fact, Mrs. Doe and the ten children were visiting the home of college friends, Dr. and Mrs. G., who resided in unincorporated Douglas County, Colorado.

109.   In fact, Mr. Doe provided the precise address to the Overland Park, Kansas, police department who had asked him for the Colorado address.

110.   In fact, Gildner did not attempt to contact the children's court-appointed guardian *ad litem* to inquire about their travel to Colorado prior to seeking the *ex parte* orders, described below.

111.   On Tuesday May 5, 2009, SRS/DCF through Gildner, Abney and Webb sought *Ex Parte Orders of Protective Custody* in the District Court of Johnson County, Kansas, a redacted copy of which one, by way of example, is attached hereto and incorporated by reference herein as **Exhibit 1** (the "*Ex Parte* Orders").

112.   At the time they sought the *Ex Parte* Orders, Gildner, Abney and Webb knew that Plaintiffs and the other Doe children were not in danger of physical harm by their parents or the relative or any other known danger, and they knew the precise address of the children's location at Dr. and Mrs. G's home, which address they themselves provided to the Colorado Agents, described below.

113.   Neither Mr. Doe, who was in Kansas and available for service of process, nor Mrs. Doe, whose location was known and who was available for service of process in Colorado, was afforded notice and opportunity to be heard at a hearing prior to the entry of the *Ex Parte* Orders.

114.   No exigency existed to prevent service of process upon Mr. and Mrs. Doe

14

prior to a hearing on the *Ex Parte* Orders.

115.   On information and belief, Gildner, Abney and/or Webb fraudulently misrepresented to the court the factual basis for obtaining the *Ex Parte* Orders.

116.   The *Ex Parte* Orders falsely state or insinuate in a manner intended to alarm and mislead:

a.   that the Parents had committed physical, sexual, mental or emotional  abuse of their children when in fact such a statement had no basis in the facts alleged in the CINC petitions or in the facts known to Gildner,  Abney and Webb;

b.   that Mr. and Mrs. Doe had refused Family Preservation Services when in fact, according to Gildner's testimony, Mr. Doe had specifically accepted the offer of Family Preservation Services by contacting Abney on April 28, 2009, and Webb on April 29, 2009;

c.   that an emergency existed which threatened the safety of the children when in fact Gildner, Abney and Webb knew that the safety of the Doe children was never in question prior to, or upon filing of, the     request for the *Ex Parte* Orders as evidenced by Gildner's testimony and her actions including but not limited to:

(1)   initially closing the SRS/DCF file,

(2)   disbelieving that the childrens' abuse two years earlier had occurred at all,

(3)   filing CINC petitions only after Mr. Doe had lodged a complaint against Gildner;

(4)   not seeking immediate custody upon filing the CINC petitions; and

(5)   failing and refusing to contact the Parents' attorney or the children's

guardian *ad litem* prior to seeking the *Ex Parte* Orders.

> d.      that Mr. Doe "would not provide any information on the whereabouts of the children" <u>when in fact</u>, according to Gildner's testimony, Mr. Doe personally instructed Gildner to contact the Parents' attorney on May 4, 2009, but Gildner intentionally refused or recklessly failed to make any such contact with the Doe's attorney prior to seeking the *Ex Parte* orders;

> e.      that "the whereabouts and safety of the children [were] unknown" <u>when in fact</u> Gildner, Abney and Webb knew that Mrs. Doe and children had gone to Colorado and, furthermore, that Gildner, Abney and Webb made no effort to obtain information from the children's court-appointed *guardian ad litem* and <u>when in fact</u> the children's safety in the Parents' custody was not in question.

117.   No exigency existed to prevent the proper completion of an application and written affidavit in support of the *Ex Parte* Orders.

118.   On information and belief, Gildner, Abney and Webb intentionally or recklessly failed to disclose material facts that, but for their omission, would have resulted in a denial of the issuance of the *Ex Parte* Orders, including but not limited to the following:

> a.      that the CINC petitions <u>contained no prohibition</u> against travel by the Parents and children before May 11, 2009, the CINC hearing date;

> b.      that the request for *Ex Parte* orders was <u>in retaliation</u> for Mr. and Mrs. Doe's complaint against Gildner and/or for their retaining counsel to represent them before the SRS/DCF;

> c.      that Gildner, Abney and Webb had <u>failed to contact</u> either the

16

children's court-appointed guardian *ad litem* or Mr. and Mrs. Doe's attorney prior to seeking the *Ex Parte* Orders*;*

        d.     that Gildner, Abney and Webb <u>disbelieved that any sexual abuse</u> had occurred at all;

        e.     that Gildner, Abney and Webb <u>had no reasonable suspicion</u> to believe that Plaintiffs or any of the  Doe children were in imminent danger of physical harm or neglect;

        f.     that Plaintiffs and the other Doe children <u>did not meet the definition</u> of "child[ren] in need of care" under K.S.A. § 38-2202(d).

119.    The *Ex Parte* Orders:

        a.     did not order that the State of Kansas or Colorado or any other persons other than Mr. and Mrs. Doe take custody of the Doe children;

        b.     did not order that Mr. and Mrs. Doe were prohibited from direct physical and verbal contact with their children;

        c.     did not order that Mrs. Doe was prohibited from indirect communication with her children;

        d.     did not order Mrs. Doe to be forcibly removed from the children's presence;

        e.     did not order that Mrs. Doe was prohibited from kissing her children and telling them goodbye prior to being forcibly removed from their  presence;

        f.     did not order that a safety plan be imposed summarily;

        g.     did not order that that Mr. Doe could not have phone contact with the children;

h.      did not order that the children's grandparents were prohibited from contacting the Doe children.

120.    On information and believe, any application for the *Ex Parte* Orders lacked any objectively reasonable basis for believing that the facts alleged in support thereof were sufficient to establish probable cause that Plaintiffs were being abused or neglected or that they were in imminent peril of abuse.

121.    At the time that Gildner, Abney and Webb sought the *Ex Parte* Orders, clearly established law required that they have an objectively reasonable basis for believing that the facts alleged in support thereof were sufficient to establish probable cause that Plaintiffs were being abused or neglected or that they were in imminent peril of abuse.

122.    Gildner, Abney and Webb acted with plain incompetence or in knowing violation of the law in applying for the *Ex Parte* Orders without any objectively reasonable basis for believing that the facts alleged in support thereof were sufficient to establish the requisite probable cause.

123.    On May 6, 2009, while Mr. Doe was in Kansas, Mrs. Doe and all of the Doe children were visiting Dr. and Mrs. G.'s quiet suburban home in Douglas County, Colorado.

124.    On said day, the Doe children ranged in ages from 6 months to 13 years old.

125.    That same day, Adame and Garza went together to the G.'s home to carry out official business on behalf of the Douglas County Sheriff's Office, the Department of Human Services for Douglas Colorado, and the Colorado Department of Social

Services, doing so at the instigation of the Kansas SRS/DCF, Gildner, Abney and Webb.

126.    When Garza arrived at the G.'s home, he stopped in front of the house where his patrol car was visible for the inhabitants and the neighbors to see.

127.    On information and belief, prior to arriving at the G.'s home, Garza and Adame had done no independent investigation to determine that probable cause existed to believe that an emergency existed with respect to the Plaintiffs' safety.

128.    Garza and Adame approached the G.'s property as a team to ring the doorbell.

129.    Someone other than Dr. G. answered the doorbell, and called Dr. G. to the front door from another room in the house.

130.    Garza was wearing a sidearm when Dr. G. greeted him.

131.    Dr. G. stepped outside his house to find out why Garza and Adame were there.

132.    Standing outside of the G.'s house, Garza and/or Adame (the "Colorado Agents") represented that they were in possession of a court order from the State of Kansas to seize custody of all ten of the Doe's children, and demanded entry and custody of the children.

133.    Adame represented to Dr. G. that she had been contacted by the Kansas SRS/DCF.

134.    The Colorado Agents did *not* possess an order from a Colorado court authorizing their actions at the G.'s home.

135.    After calling an attorney-friend by telephone, Dr. G. asked the Colorado

19

Agents to produce a warrant that authorized them to enter his home or to produce any order from a Colorado court authorizing their demands.

136.   One or more of the Colorado Agents represented to Dr. G. that they were not required to obtain a warrant to have legal authority to enter the G.s' home.

137.   One or more of the Colorado Agents further stated to Dr. G., or stated in words to the effect that, "We do this all the time".

138.   When Dr. G. expressed doubt about the Colorado Agents' authority to enter his home, Garza became belligerent, began raising his voice, and threatened Dr. G. with arrest or contempt for interfering with law enforcement.

139.   Garza further threatened Dr. G. with words, or words to the effect that, "I don't care what your lawyer says, we're coming in and we're taking these kids."

140.   Due to the Colorado Agents' visible weapon, their false claims of legal authority, their use of threats, intimidation, and loud and belligerent demeanor, Dr. G. was powerless to prevent them from entering his house over his objection.

141.   Inside the G.'s house, the Colorado Agents saw no emergency conditions that threatened the safety of the Plaintiffs and the other Doe children.

142.   Despite there being no emergency requiring it, the Colorado Agents commanded Mrs. Doe to vacate the G.'s house immediately, causing tremendous distress and anxiety to the Plaintiffs and their siblings.

143.   The Colorado Agents falsely claimed that Plaintiffs and the other Doe children were in the custody of the State of Kansas.

144.   In fact, the Colorado Agents had every opportunity to observe for themselves that there was no valid order placing the Doe children into the custody of

20

the State of Kansas.

145.    The Colorado Agents falsely claimed that Mrs. Doe was "high risk" or used similar words to malign her in front of the Doe children.

146.    The Colorado Agents issued summary orders inside the G.'s house, both verbal and written, without a supporting court order, without prior notice, hearing or probable cause, which the G's, Mrs. Doe and the Doe children were forced to obey by virtue of the Colorado Agents' threats of force, intimidation and false claims of legal authority,

147.    Inside the G.'s house, Adame signed a hand-written document, a redacted copy of which is attached as **Exhibit 2** (the "Colorado Order").

148.    At the top of the Colorado Order are the names "Colorado Department of Social Services" and "Douglas County Department of Human Services."

149.    The Colorado Order, paragraph 3, states: "The children are currently in the custody of Kansas State Social Services."

150.    In fact, the Colorado Agents had no reasonable suspicion or probable cause to believe that the Doe children were in the custody of Kansas State Social Services, based on the plain and obvious language of the *Ex Parte* Orders.

151.    The Colorado Order required the G.'s to take custody of the Doe's children and in paragraph 5 therein, to "follow through with this safety plan . . ."

152.    The Colorado Order, paragraph 2, states: "[Mrs. Doe] will have no contact, physical or verbal with any of the children, including any communication through Dr. G. and his wife Mrs. G. or any 3rd party."

153.    In a later phone call from Adame to Dr. G., she verbally added other

prohibitions to the Colorado Order, prohibiting Dr. G. from allowing Mr. Doe, or even his parents, to talk to the children on the phone or have any contact with them.

154.   Adame's additional verbal orders were issued in cooperation and agreement with Gildner, Abney and/or Webb.

155.   Adame's written and verbal orders were outside the scope of the Kansas *Ex Parte* Orders.

156.   Adame's written and verbal orders were outside of her authority under Colorado law.

157.   Adame had no reasonable suspicion to believe that she had legal authority to issue the verbal and written prohibitions contained in the Colorado Order.

158.   Inside the G.'s house, the Defendants' actions caused panic and severe emotional distress to Plaintiffs and the other Doe children, who were weeping and distraught that their mother was forced to leave them with no explanation, reassurances, hugs or kisses due to the cruel and outrageous prohibitions by Adame and Garza, instigated by Gildner, Abney and Webb.

159.   At the time they delivered the Colorado Order, the Colorado Agents were on notice that the Does' baby was suffering from a rash, that other children were taking prescription antibiotics to treat strep throat conditions, and that other children were taking pink eye medication.

160.   The Colorado Agents disregarded the fear and suffering and chaos they could see they were imposing on Plaintiffs, their siblings, their mother, and on Dr. and Mrs. G.

161.   The Colorado Agents verbally informed the G.'s that government agents

from Kansas would arrive at an unspecified time/day to take physical custody of the Doe children from Dr. and Mrs. G.

162.   In a subsequent phone conversation, Adame essentially admitted her knowledge that the seizure of the Doe children was illegal by stating to Dr. G. the words, or words to the effect that, "Something doesn't seem right."

163.   The G.'s assessed the situation of the children, who were weeping from being forcibly deprived of their mother's companionship and care, and who were ill and in need of medical supervision to administer their prescription antibiotics.

164.   Based on the children's best interests, the G.'s personally transported the ten Doe children to Kansas from Colorado, driving them all through the night, in order to protect the children from being further frightened and traumatized by the possibility of riding hours and hours with strangers/government agents from Kansas, who the Colorado agents had said would be arriving to seize the children.

165.   The G.'s left a voice mail message with Adame to keep her informed about the children's whereabouts.

166.   The G.'s delivered the Doe children the next day to the custody of SRS/DCF in Johnson County, Kansas.

167.   The G.'s unselfishly asked SRS/DCF, in the best interest of the children, to place them all together in the G.'s temporary custody or in the custody of the children's paternal grandparents.

168.   Rather than placing the children together in the G.'s custody or the grandparents' custody, SRS/DCF disregarded the children's best interest and proceeded arbitrarily to separate them from each other, from their parents, from their

grandparents, from the G.'s and from anyone known to them, causing the children obvious mental and physical anxiety, needless worry and grief.

169.   At the office of the SRS/DCF, personnel made false and outrageous statements maligning Mr. and Mrs. Doe in front of the Doe children and third parties.

170.   At the office of the SRS/DCF, personnel made false and outrageous claims, in the presence of the children and third parties, pronouncing that the children were about to be permanently taken from their parents, that Mr. and Mrs. Doe's parental rights were about to be terminated, and that all ten children would be permanently adopted by different families.

171.   The actions by Gildner, Abney and Webb were not based on reasonable and articulable suspicion that Plaintiffs or the other Doe children were being abused or neglected by their parents nor that they were in imminent peril of abuse.

a.   failing to identify a party to whom custody of the Doe children was being awarded;

b.   failing to "specify facts" forming the basis for finding that "an emergency exists which threatens the safety of the [children];"

c.   failing to state facts that a threat to the children's safety was "immediate;"

d.   failing to order a duly authorized law enforcement officer to take custody of the Doe children;

e.   failing to prohibit Mr. and Mrs. Doe from visitation or custody of their children.

172.     Any reliance by the Colorado Agents on the Kansas *Ex Parte* Orders was unreasonable because said orders were patently defective on their face for reasons including but not limited to:

a.     failing to identify a party to whom custody of the Doe children was being awarded;

b.     failing to "specify facts" forming the basis for finding that "an emergency exists which threatens the safety of the [children];"

c.     failing to state facts that a threat to the children's safety was "immediate;"

d.     failing to order a duly authorized law enforcement officer to take custody of the Doe children;

e.     failing to prohibit Mr. and Mrs. Doe from visitation or custody of their children.

173.     The *Ex Parte* Orders violated K.S.A. § 38-2242 (b)(1) by failing to set forth "facts" upon which "the court has determined there is probable cause to believe the allegations in the [verified] application are true."

174.     The *Ex Parte* Orders were "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" by Garza.

175.     At the time that Garza and Adame seized the Plaintiffs, clearly established law made it "incumbent" upon any officer executing seizure orders to "ensure that such seizure is lawfully authorized."

176.     No officer or social worker could have objectively believed that the Kansas *Ex Parte* Orders were lawfully authorized.

177.   The Kansas *Ex Parte* Orders had not been docketed by a Colorado court as required in C.R.S. § 14-11-101(4) and the Uniform Child Custody Jurisdiction and Enforcement Act, C.R.S. §14-13-301 *et. seq.* (the "UCCJEA") and Defendants deprived Plaintiffs of the warrant, notice and hearing protections required by the UCCJEA and the Constitution.

178.   Garza knew no facts upon which to form a reasonable suspicion that the Doe children were abandoned, lost, or seriously endangered in such children's surroundings, or seriously endangering others, requiring immediate removal to be necessary for such children's protection or the protection of others;

179.   Garza knew no facts upon which to form a reasonable suspicion that the Doe children had run away or escaped from such children's parents, guardian, or legal custodian or that the children's parents, guardian, or legal custodian had not made a report to a law enforcement agency that the children had run away from home;

180.   Garza knew no facts upon which to form a reasonable suspicion that an arrest warrant had been issued for such children's parent or guardian on the basis of an alleged violation of C.R.S. § 18-3-304.

181.   In taking the Doe children into custody without a Colorado court order, Garza violated C.R.S. § 19-3-401 "Taking Children into Custody [by a law enforcement officer]".

182.   For purposes of obtaining an order of protective custody under C.R.S. § 19-3-405, Adame and Garza knew no facts upon which to form a reasonable suspicion to believe that continuing the Doe children's care and custody with Mr. and Mrs. Doe would present a danger to the children's life or health in the reasonably foreseeable

future.

183.    Adame and Garza violated C.R.S. §19-3-405 by failing to obtain an order of protective custody from a Colorado court prior to seizing the Doe children.

184.    Adame and Garza lacked any objectively reasonable basis for believing that the obviously defective Kansas *Ex Parte* orders were enforceable under the United States Constitution or Colorado law.

185.    At the time that Garza and Adame executed upon the Kansas *Ex Parte* Orders by seizing Plaintiffs and their siblings, clearly established law required that authorities have an objectively reasonable basis for believing that the facts alleged in support thereof were sufficient to establish probable cause that Plaintiffs were being abused or neglected or that they were in imminent peril of abuse.

186.    Garza and Adame acted with plain incompetence, or in knowing violation of the law, in executing upon the Kansas *Ex Parte* Orders without any objectively reasonable basis for believing that the facts alleged in support thereof were sufficient to establish the requisite probable cause.

187.    Plaintiffs and their siblings were kept in detention with foster families and were deprived of the love, care and companionship of their parents, grandparents, siblings and Dr. and Mrs. G. for five days following their seizure.

187a   The CINC court found and made an entry into the court's minutes, after testimony by Gildner, that no probable cause existed for Plaintiffs' removal from their Parents and Grandparents.

188.    Adame and Garza's actions were the result of an unconstitutional policy, practice or custom by Douglas County to ignore the insufficiency of out-of-state *ex parte*

27

court orders and the procedures required by the Colorado Uniform Child Custody Jurisdiction and Enforcement Act and thereby to ignore Plaintiffs' procedural and substantive rights to liberty and to familial association.

188 a. Douglas County adopted a policy contained in a standing order, CJO 07-11, authorizing the warrantless entry and seizure of Plaintiffs, which policy was the moving force behind the deprivation of Plaintiffs' liberty, procedural due process, familial association and right to travel.

189.   In the alternative, Douglas County reasonably should have known that Adame and Garza and its other personnel would likely violate the Plaintiffs' constitutional rights without a policy prohibiting personnel from seizing children without probable cause and in derogation of due process of law on the basis of obviously defective out-of-state *ex parte* orders.

190.   Douglas County failed to adopt and/or implement any policy or policies prohibiting the unconstitutional seizure of children on the basis of out-of-state *ex parte* orders when such policy was needed to prevent predictable violations by Douglas County personnel.

190a. In response to Interrogatories asking for written documents "containing the County's official policy for handling requests to enforce out-out-state ex parte orders…" Douglas County responded in salient part: "[T]here is no responsive written document . .

191. The need for an official policy prohibiting the seizure of children on the basis of out-of-state *ex parte* orders was so obvious that Douglas County's failure to adopt and implement any such a policy is properly characterized as deliberate indifference.

191a. The need was obvious to Douglas County because its own policy manual,

PAT-N-237, ¶D states: "Out-of-state Court Orders are not valid on their face in Colorado," except for Foreign Protection Orders described in PAT-D-201 as orders "other than child support or custody orders," and defined by C.R.S. §§18-6-803.5 and 13-14-104.

192.   Douglas County was deliberately indifferent to training its employees, including Adame and Garza, in protecting the Plaintiffs' procedural and substantive rights under the United States Constitution and the Uniform Child Custody Jurisdiction and Enforcement Act (the "UCCJEA") to be free from unlawful seizure without probable cause.

193.   In the alternative, Douglas County acted with deliberate indifference in authorizing or in failing to adopt a policy or in failing to train personnel, including Garza and Adame, to ensure that the E*x Parte* orders to seize Plaintiff and his siblings were executed upon only after such orders were examined for facial validity as to probable cause.

194.   By working together either in meetings and over the phone and by other means of electronic communication, Defendants Adame and Garza conspired and agreed with Gildner, Abney, Webb to deprive Plaintiffs of their rights as set forth above.

195.   Garza, Adame and Douglas County's unconstitutional acts, policies, practices, customs or deliberate indifference were the proximate cause of damages to Plaintiffs in an amount to be proved at trial.

**FIRST CLAIM FOR RELIEF**
**(Unlawful Seizure - Against Adame and Garza)**

196.   Plaintiffs incorporate by reference the foregoing allegations and further allege:

197.   Without reasonable suspicion or probable cause, Adame, Garza approved and/or conducted an unlawful seizure, within the State of Colorado, of the Doe children by which Plaintiffs were deprived of their liberty without due process when they were prohibited by the Colorado Order, and the verbal orders described hereinabove, from any movement or travel with their mother, father and grandparents, who owned a home nearby.

198.   Under 42 U.S.C. § 1983,   Adame and Garza are liable for causing Plaintiffs to be seized and deprived of their liberty in violation of the 4th Amendment of the United States Constitution.

**SECOND CLAIM FOR RELIEF**
**(Deprivation of Procedural Due Process – Against All Defendants)**

199.   Plaintiffs incorporate by reference the foregoing allegations and further allege:

200.   Defendants failed to afford Plaintiffs notice and hearing in Colorado, thereby depriving Plaintiffs of their right to procedural due process under the Fourteenth Amendment to the United States Constitution and under Colorado's UCCJEA.

-201.   Under 42 U.S.C. § 1983, Adame, Garza and Douglas County are liable for causing Plaintiffs to be seized and deprived of their right to procedural due process.

**THIRD CLAIM FOR RELIEF**
**(Deprivation of Familial Association – Against Adame and Garza)**

202.   Plaintiffs incorporate by reference the foregoing allegations and further allege:

203.   Adame and Garza caused Plaintiffs to be deprived of the love, affection, care, companionship and other tangible and intangible goods connected to Plaintiffs' relationship with their parents, siblings and grandparents.

204.   Plaintiffs' relationships with their parents, siblings and grandparents are familial relationships protected by the United States Constitution.

205.   Adame and Garza had specific intent to separate Plaintiffs from their parents, siblings and grandparents as evidenced by: agreeing with Gildner, Abney and Webb to execute upon the Kansas *Ex Parte Orders* in Colorado; agreeing not to provide notice and hearing in Colorado under the UCCJEA; obtaining the Douglas County, CO address from same; acting together and communicating with each other to evict Plaintiffs' mother, Mrs. Doe, from the home of Dr. and Mrs. G. while prohibiting Plaintiffs from leaving with their mother and while prohibiting Plaintiffs, through written and verbal orders, from movement and travel with their mother, father and grandparents; and by the fact that said Defendants knew their concerted actions could and did result in Plaintiffs' detention.

206.   Adame and Garza's actions were shocking to the conscience of Plaintiffs and to any reasonable person, and furthermore, Adame and Garza directed their conduct and statements described above with knowledge they would adversely impact Plaintiffs' familial relationships.

31

207.   In balancing Plaintiffs' protected interests in their familial relationships with the interest of the government in Plaintiffs' health and safety, the Plaintiffs' interests prevail against the said Defendants' unwarranted intrusion, described above, upon their rights.

208.   Under 42 U.S.C. § 1983, Adame and Garza are liable for causing Plaintiffs to be deprived of their familial associations in violation of the 14th Amendment of the United States Constitution.

### FOURTH CLAIM FOR RELIEF
### (Conspiracy - Against, Adame and Garza)

209.   Plaintiffs incorporate by reference the foregoing allegations and further allege:

210.   Adame and Garza conspired and agreed with Gildner, Abney, Webb, as set forth hereinabove, and as more specifically set forth in paragraph 205, to deprive the Plaintiffs of their rights set forth herein.

211.   Adame and Garza were willing participants in acting together with Gildner, Abney, Webb to deprive Plaintiffs of their rights.

212.   Adame and Garza are liable for their conspiracy under 42.U.S.C. §1983, or in the alternative, under Colorado common law.

### FIFTH CLAIM FOR RELIEF
### (Deprivation of Right to Travel – All Defendants)

213.   Plaintiffs incorporate by reference the foregoing allegations and further allege:

214.   Plaintiffs were entitled under the Constitution to a right to travel to Colorado because no restriction on their travel or restriction on their Parents' custody of

32

them had been imposed prior to the seizure, described above.

215.   In having Plaintiffs seized, Defendants proximately caused Plaintiffs to be deprived of their right to travel.

216.   Under 42 U.S.C. § 1983, Adame, Garza and Douglas County are liable for causing Plaintiffs to be deprived of their right to travel.

## SIXTH CLAIM FOR RELIEF
### (Exemplary Damages – Against Adame and Garza)

217.   Plaintiffs incorporate by reference the foregoing allegations and further allege:

218.   The actions of Adame and Garza were attended by intent, recklessness, callous disregard or indifference to Plaintiffs' rights, such that Plaintiffs are entitled to exemplary damages.

## SEVENTH CLAIM FOR RELIEF
### (Unlawful Policy or Deliberate Indifference – Douglas County)

219.   Plaintiffs incorporate by reference the foregoing allegations and further allege:

220.   Douglas County adopted as its policy or practice, CJO 07-11, which, along with the statement, "we do this all the time," demonstrate that Douglas County had authorized county Plaintiffs' warrantless seizure without an exigency and/or based on out-of-state *ex parte* court orders in violation of the United States Constitution and Colorado law, including but not limited to the Colorado Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA").

221.   Garza's actions were representative of Douglas County's unwritten policy, custom or practice of enforcing out-of-state *ex parte* court orders in violation of

Colorado's UCCJEA.

222.   In the alternative, prior to seizing Plaintiffs, Douglas County acted with deliberate indifference in failing to adopt a policy requiring Garza, or in failing to train personnel, including Garza, to comply with the United States Constitution and Colorado law, including but not limited to the Colorado UCCJEA

223.   Under 42 U.S.C. § 1983, Douglas County is liable for causing Plaintiffs to be seized and deprived of their liberty in violation of the 4th Amendment of the United States Constitution.

## JURY DEMAND

224.   Plaintiffs demand a jury on all claims triable to a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court will award them:

A. Compensatory and/or general damages in the amount of $3,600,000.00;

B. Exemplary damages in an amount to be determined at trial;

C. Attorney's fees and costs; and

D. Such other and further relief that the Court deems just and proper.

Respectfully submitted,

MESSALL LAW FIRM, LLC

/s/ Rebecca R. Messall, Counsel for Plaintiffs
Rebecca R. Messall, CO Bar no. 16567
7887 E. Belleview Avenue, Suite 1100
Englewood, CO  80111
Phone 303.228.1685
Fax 303.228.2281
Email: rm@lawmessall.com
www.lawmessall.com

Attachments
Exhibit 1 – Ex parte order
Exhibit 2 – Colorado order